OPINION OF THE COURT
Lewis Bart Stone, J.
*570 Norma Colon was indicted for the crime of failure to disclose the origin of a recording in the first degree, a class E felony, under Penal Law § 275.40. Following a trial by jury, she was convicted on January 19, 2005 of the lesser included crime of failure to disclose the origin of a recording in the second degree, a class A misdemeanor, under Penal Law § 275.35, which lesser included crime was charged at Colon’s request. Penal Law § 275.35 provides:
“A person is guilty of failure to disclose the origin of a recording in the second degree when, for commercial advantage or private financial gain, he knowingly advertises or offers for sale, resale, or rental, or sells, resells, or rents, or possesses for such purposes, a recording the cover, box, jacket or label [sic] does not clearly and conspicuously disclose the actual name and address of the manufacturer or the name of the performer or principal artist. The omission of the actual name and address of the manufacturer, or the omission of the name of the performer or principal artist, or the omission of both, shall constitute the failure to disclose the origin of a recording.”
Failure to disclose the origin of a recording in the second degree is a class A misdemeanor.
The sole relevant difference here between the first and second degrees is that a first degree conviction requires proof that over 1,000 nondisclosing recordings were sold or offered for sale, while a second degree conviction requires proof that one of such recordings was to be sold or offered for sale.
At the charging conference prior to the submission of the case to the jury, the People urged, over defense objection, that the court instruct the jury that to convict on either[1] crime, the People must prove beyond a reasonable doubt:
1. either that the recording or recordings failed to disclose the manufacturer of the recording or the name or names of the principal artist or artists, and
2. that Colon knowingly sold or offered the recording for sale; the People did not have to prove that Colon knew that the recording or recordings failed to make the required disclosure.
*571 The court, after considering counsel’s arguments and being unable to find any relevant reported decision, adopted the People’s positions on both issues.
The People, represented by the District Attorney of New York County, advised the court that they were unaware of any prior prosecution by their office under the Penal Law provisions since the 1995 amendments to Penal Law article 275 (L 1995, ch 450 [hereafter chapter 450]) nor were they aware of any prosecution by another District Attorney which might provide precedential guidance.
Although the court found the People’s position on the first issue to be clearly correct, the second issue, whether scienter had to be proved as to the failure to disclose, was not as clear to the court. As this scienter issue is effectively one of first impression in an area where developing technology and market forces are making it more likely that there will be future prosecutions, this sentencing memorandum has been written to set forth the basis for this court’s decision.
The Facts of the Case
Colon and her son, Philip Orama, who testified on her behalf, operated and owned the Harlem Music Store, a retail music store, located at 567 West 125th Street in New York County. Colon, who did not testify, was the lessee of the store and acknowledged to the police upon her arrest that she was the store manager, a fact that Orama corroborated. Orama testified that he was also the manager but that Colon “fronted” for him because “financial difficulties” could not permit him to be the owner of record.
In early June 2004, based upon information obtained in connection with an arrest in California,[2] the Recording Industry Association of America (RIAA), the trade association representing the manufacturers of over 90% of legitimate music recordings in the United States, dispatched an investigator, Louis Castillo, to the store to investigate whether the store was dealing in pirated or counterfeit music products. Castillo purchased compact discs of recordings (each a CDR) at the store on June 3, June 4, and June 16, and having compared the songs on two of the CDRs with his RIAA-supplied computer program (which enabled him to ascertain the true owner of the copyright of *572 certain of the songs), he concluded that a number of the songs on such CDRs were owned by RIAA members who had not authorized their reproduction or sale on CDRs and brought the situation to the attention of the New York County District Attorney’s Office which applied for and was granted a search warrant to search the store and seize the CDRs as evidence. Before the warrant was executed on June 25, 2004, Castillo purchased an additional CDR at the store using prerecorded buy money. He checked the music tracks on such CDR with his computer program, and found that the CDRs he purchased similarly contained a number of unauthorized tracks. Castillo so advised the officers who were to execute the warrant; they executed the warrant seizing approximately 15,000 CDRs and 200 digital video discs.[3] At the time of the arrest, the prerecorded buy money was recovered from Colon’s person.[4]
The store carried two types of music recordings, CDs and CDRs. The former were displayed in the public area and the latter were secreted underneath the counter, behind wall posters hanging behind the counter in areas unaccessible to the public and in a back room. No evidence was presented that the CDs in the public areas were not legitimate merchandise. The CDRs were primarily “DJ mixes.”[5] The four CDRs purchased by Castillo and their packaging, which were placed in evidence, did not disclose the manufacturer of the recorded songs. Although testimony was presented that almost 15,000 other CDRs were seized from the store pursuant to the search warrant at the *573 time of Colon’s arrest, no direct testimony as to the nondisclosure of the required information on such CDRs or their packaging was placed in evidence, either by testimony or placing such packaging or pictures of them into evidence. Conviction on the lesser included count could therefore have been properly based on the jury’s finding that the People had not proved beyond a reasonable doubt that such other recordings failed to make the proper disclosure.
It is not clear how much money is involved in the store’s activities. Recreating figures from criminal enterprises, which rarely make available accurate books and records for audit, is speculative. The only clear fact is that almost 15,000 CDRs were recovered from the store when the search warrant was executed, and all were secreted from and not subject to browsing by the public, unlike the full stock of CDs. A reasonable inference can be drawn (at least for sentencing purposes) from this fact that all or most of the hidden CDRs were “illegal” in some way. Similarly, when Castillo purchased the CDRs he paid an even number of dollars, and his purchases were not rung up in the register. Although hardly a statistically conclusive sample, these purchases are evidence of sales tax avoidance and a CDR pricing structure. Further, there is no evidence as to how many times the store’s inventory “turns” in a year, and any allowance for items which do not sell, or whether they are disposed of by discounting or destruction. While industry statistics for many lines of retail can lead to an estimate of annual sales from a snapshot of gross inventory, the court is unaware of (and neither the People nor the RIAA have suggested) any similar guidelines for a retailer of pirated recordings. Given, however, the size of the store’s inventory, and an assumption that there is a regular turnover and that taxes were not being paid, the enterprise is substantial and the losses to the public and the recording industry are great.
While the artists’ names were “disclosed” on the four CDRs purchased by Castillo on their packaging, no manufacturer’s name or street address was disclosed, as required by the statute. Each CDR listed the name of the purported “DJ.” While some disclosed a Web site address, none of the four had a mailing or street address. Further, where a Web site was given, it was impossible to access such site.
*574 Intellectual Property and its Theft
The United States has recognized and has protected certain types of intellectual property such as patents, copyrights and trademarks since its inception.[6] Other forms of intellectual property, such as trade secrets, are recognized and protected by state law. While these rights have always been valuable and important to the economy of the United States, with the advent of the digital and computer revolutions, these rights now represent a larger and growing portion of the American economy, especially in New York, where music, publishing, programming and the arts are major industries. Although new technologies have enhanced the value of many of these rights, such technologies have often also made it easier for thieves to steal this property from its owners. These thieves and their fences and cohorts, whether domestic or foreign, deprive the artists and creators of intellectual property and rarely (not unlike the classic thief or fence of tangible personal property) pay taxes, whether as a sales tax on the resale of the stolen property or income taxes on their earnings. Orama testified that “his” store retailed CDRs for $7, a fact corroborated by Castillo’s testimony, who testified that he paid $7 for a single CDR or three for $20. At these prices the sale of the inventory of 15,000 units would generate about $100,000 in gross proceeds which in turn should generate about $9,000 in city and state sales taxes. As it is reasonable to assume that the store would have a number of inventory turnovers per year, this sales tax loss revenue is substantial. Although Orama testified that his store “made no money” (and thus impliedly would not generate income taxes), evidence of the nonrecorded sale, with the prerecorded buy money which ended up in Colon’s pocket, signifies something else.
The unchallenged expert testimony, introduced by both the People and the defense, illustrates what occurs in the gray world of recording piracy and how new technology is playing a bigger role as pirates have become a big and organized criminal enterprise.
Recording artists, especially successful ones, generally work with music companies to record and market their music. The artists assign their copyrights to these companies for compensation, which may be a fixed payment, royalties, or both, depending on their contract. The record companies make the sound *575 recordings and retail them to the public, with legitimate recordings being produced and sold in CD format. The CD format has, in the past decade, replaced records and tapes to a great extent. Recent technical improvements and the reduced cost of electronic components now available at retail stores have made it easier, cheaper and quicker to copy some or all of the music from a CD to another disc, known as a CDR. Computers have also made it easier and less expensive to create professional looking graphics to accompany CDRs being sold to the public. Testimony in this case illustrates how pirates “assemble” a CDR from different sources, to create what is promoted as a DJ mix, which is then marketed under the name of a “disc jockey” who ostensibly selected and played the songs. When the mix includes recordings produced and owned by another person without permission, that other person’s property has been stolen, or in the vernacular “pirated,” and the person who knowingly sells that disc is no more than a fence or receiver of stolen property. It does not matter whether other songs or cuts in a “mix” may be authorized to be included in the mix, but the inclusion in the mix of one or more unauthorized songs is piracy.
CDRs differ from CDs in that they are manufactured and sold as a medium to be recorded upon, like a blank tape, whereas CDs are sold only as finished recordings. By use of a personal computer[7] with an appropriate (and inexpensive) disc drive or a stand-alone recording device, some or all of the contents of a CD may be cheaply and accurately reproduced on a CDR, and excerpts from many CDs (or other CDRs) may be recorded to a CDR.
Just as a blank audiotape is not an inherent item of criminal contraband, a CDR has many legitimate uses. Just as a blank audiotape can be used to pirate copyrighted material, so can a CDR. One difference from most tapes[8] is that because CDs are recorded in digital rather than in analog form, reproducing the *576 recording on a CDR can be accomplished quickly, cheaply and. accurately and the cost of doing so continues to fall as technology regularly improves.
The ease and low cost of reproduction have spawned a new class of criminal entrepreneurs who have adopted this technology in order to “rip-off’ the public, the record companies and the artists. By “stealing” the recording information, they can avoid the costs of the recording studio, including the salaries of musicians and technicians needed to make the original recording, the marketing costs to develop and promote artists, the fees and royalties paid to the artists, as well as the taxes paid on incomes and royalties and on sales and services by the legitimate recording companies. The artists’ own royalties and abilities to negotiate better deals are similarly adversely affected.
Although federal copyright law proscribes violations of copyright law, whether for commercial or personal use, New York elected, in Penal Law article 275, to criminalize only commercial piracy by expressly excluding noncommercial reproductions of recordings from its ambit. (See Penal Law § 275.45.)
Penal Law article 275 is designed to reach the various players in the criminal enterprise. Making an unauthorized recording is proscribed by Penal Law § 275.05. Advertising and reproducing a recording without the consent of the owner or performer is proscribed by Penal Law § 275.25. Penal Law § 275.35 deals with an attempt to circumvent the prohibition of counterfeiting under section 275.10 by criminalizing the failure to acknowledge the manufacturer or artist because if the manufacturer and artist were truthfully acknowledged, counterfeiting would have occurred, and conviction under Penal Law § 275.35 would be simple.[9]
Statutory Construction
Colon’s first contention was that to convict, there must be proof of both lack of manufacturer’s name and the name of the recording artist.
While Penal Law §§ 275.35 and 275.45 were construed in People v Burke (NYLJ, Apr. 11, 1994, at 31, col 5 [Grim Ct, Bronx County]) to require the People to prove that the name of the manufacturer and the names of the principal artists were *577 missing, the Legislature, in 1995, amended section 275.35 by enacting chapter 419 to avoid such a construction by adding the last sentence. (See Sponsor’s Mem, Bill Jacket, L 1995, ch 419; Mem of Legislative Representative of City of NY, 1995 McKinney’s Session Laws of NY, at 2152.) As chapter 419 clearly eliminated the requirement that the People prove both failure to disclose the manufacturer and the artist, this defense argument fails.
Colon’s second contention is a closer question. Penal Law § 15.15, which provides a general standard for the construction of provisions of the Penal Law, provides:
“When the commission of an offense defined in this chapter, or some element of an offense, requires a particular culpable mental state, such mental state is ordinarily designated in the statute defining the offense by use of the terms ‘intentionally,’ ‘knowingly,’ ‘recklessly’ or ‘criminal negligence,’ or by use of terms, such as ‘with intent to defraud’ and ‘knowing it to be false,’ describing a specific kind of intent or knowledge. When one and only of such terms appears in a statute defining an offense, it is presumed to apply to every element of the offense unless an intent to limit its application clearly appears.”
The defense contends that, as Penal Law § 275.35 uses the term “knowingly,” Penal Law § 15.15 requires for conviction a proof that the defendant knew that the name and address of the manufacturer was not disclosed as there is no express negation in Penal Law § 275.35 that such knowledge need not be proved.
This court finds, viewing the structure of Penal Law article 275 in light of its legislative history, such a reading is both contrary to the structure of the entire article and the Legislature’s intent and would make Penal Law §§ 275.35 and 275.40 meaningless and toothless. Thus, the court finds, as required by Penal Law § 15.15, that “an intent to limit its application clearly appears.”
A grammatical parsing of Penal Law § 275.35 which would ordinarily be primary source of intent is not helpful here. The statute itself clearly omits some word or phrase just as it segues into the clause defining what must be disclosed.[10] Penal Law § 275.35 is, however, not thus rendered impotent or unenforce *578 able because the totality of the language, even with the elision, clearly advises and gives notice of the acts prohibited. As an analysis of the actual text is inconclusive, the court must turn to legislative history and precedent to determine whether they show a “clear intent.”
Penal Law article 275 deals with various wrongful behavior relating to recordings in a commercial setting — to be convicted under this article one must be in some portion of the piracy business. New York, for example, does not purport to punish as a criminal a member of the public who has taken a recording device to a concert to record it or has downloaded a song from Napster or elsewhere for private use or to share with a friend.[11] While criminalizing such behavior in a noncommercial setting may raise due process considerations, in the absence of a scienter requirement such constitutional issues are absent here where what is effectively being punished is clearly analogous to commercial dealing in stolen, misbranded, dangerous or adulterated goods or contraband.[12]
A merchant cannot hide behind ignorance when the law imposes a requirement that the goods by such merchant be properly marked to show their origin. Here there was no origin shown. Colon cannot here even argue that she was the victim of a wholesaler who supplied her falsely marked goods.
*579 While not exactly on point, People v Omage (18 NY2d 770 [1966]) is instructive. In that case, the Court of Appeals reviewed a conviction under the Agriculture and Markets Law, based on a stipulation of facts. The facts stipulated were that a wholesale distributor of meats had contracted with a manufacturer for a supply of all meat frankfurters and bologna. In some of such products, the manufacturer had included nonmeat extenders. (There was no indication that the product was unsafe or unhealthy.) The Court of Appeals upheld the conviction of the wholesale distributor rejecting due process arguments that knowledge of the presence of extenders was needed for a conviction (the statute, unlike Penal Law § 275.35, did not include any “knowing” elements).
While perhaps harsh to Mr. Omage, who at least contracted for all meat products, the case is illustrative of the legislative approach, approved by the Court of Appeals, that punishment for including proscribed goods in the commercial chain of production and sales of goods sold to the public could be imposed on anyone in the commercial chain through whose hands the proscribed goods passed. While not expressed, the theory is one of the responsibility of a merchant to do its own diligence to protect the public and also to prevent merchants from turning a blind eye to improper goods which they sell.
The defense position would create a safe harbor for pirates— “don’t look and you don’t have to tell.” It is no argument that an “innocent” employee or “street vendor” dealing in these pirated goods might be swept up. The street vendor is as much a merchant who should be responsible for the wares he sells the public,[13] as an employee of a criminal enterprise is part of the enterprise.
The very nature of Penal Law § 275.35 as a “loophole closer” to counterfeiting reinforces this conclusion that knowledge of the lack of disclosure on the goods one has knowingly sold was not intended to be an element of this crime. The legislative history of this section shows a clear intent to criminalize piracy, whether by counterfeiting or by making an end run around anticounterfeiting provisions by omitting to disclose the manufacturer or artist. Reading into Penal Law § 275.35 the need to *580 prove knowledge that the defendant knew the manufacturer’s name and address were not disclosed would have the effect of opening the door for this end run.
Colon lastly also contends that the disc jockey or mixer is the “manufacturer” and that (at least for some of the CDRs), the DJ’s names and Web site addresses were given. This contention is meritless. Penal Law § 275.15 defines “manufacture” to be recording or fixing on recording a performance. Accordingly, a “DJ” who reproduces tracks from existing recordings is not the manufacturer whose name and address must be disclosed under Penal Law § 275.35. Orama’s testimony that the CDRs were not recorded from five performances supports this conclusion.
The People, in their presentence memoranda, urge in effect that because there was overwhelming evidence that Colon “knew full well that her pirated CDRs were illicit,” error, if there was any in the charge, was harmless. This position is disingenuous if not dangerous to the integrity of the criminal process in light of the fact that the court’s instructions were given with the express support of and upon the urging of the People. Whether the court, as the trier of fact, could have found, on the evidence presented at trial, that Colon knew full well she was dealing in pirated and illegal goods is not relevant. Evidence that she knew that the CDRs did not disclose the name and address of the manufacturer was at best inferential and would clearly have been a question for the jury as trier of fact. Although the court gave a generic charge on inference, the court gave no specific instruction on this specific inference, and the People, having received the instruction they had sought on sci-enter, did not argue such inference in their summation. If penalizing a failure to disclose must require a knowledge of the omission of the true manufacturer’s name and address for conviction, few but the legally trained members of the pirate crew would be aware of this technical issue, most would neither know nor care.[14]
Accordingly, this court finds that the only rational reading of Penal Law § 275.35 and the only rational intent of the Legislature in enacting it is that express knowledge of the lack of the name and address need not be shown for conviction under the statute.
*581 Because this court has considered that the defendant was engaged, with her son, as a retail component in a large-scale criminal piracy enterprise, that notwithstanding her relatively clean criminal record (being a 23-year-old conviction for welfare fraud) that substantial jail time on her misdemeanor conviction is warranted.
Thus, the court imposes a sentence of one year in jail and a fine of $1,000. While the RIAA has recommended that the court impose substantial restitution in the amount of $88,000 payable to the RIAA, the court declines to do so.
Restitution is a remedy to force a criminal to disgorge the proceeds of her crime to the victim or victims thereof,, or even in certain cases, to reimburse victims for certain expenses imposed on them. (See Penal Law § 60.27.) Restitution, however, is meant to prevent unjust enrichment of the criminal and not to have an independent punitive purpose. As restitution is not to be punitive, it can only be a civil remedy imposed on the grounds that as the verdict found the essential facts supporting such civil liability beyond a reasonable doubt, it would be wasteful to require a civil lawsuit thereafter to impose civil liability; the jury’s findings would constitute collateral estoppel in such case. Penal Law § 60.27 is the exception to the rule that the criminal process should not be used to achieve a civil result. Because of this limited role of the court on determining restitution, general considerations surrounding the incident, the crime and the defendant’s behavior which may be considered by the court in setting penal sanctions such as incarceration and fines, cannot be extrapolated to provide “restitution” as RIAA wishes. Ms. Colon has been convicted by the jury only of selling one or more recordings without disclosing the manufacturer. The court cannot be assured from this verdict that the number of pirated recordings exceeded four. The jury acquitted on the charge that more than 1,000 were sold or offered for sale. As such acquittal turns on the reasonable doubt standard, it cannot constitute collateral estoppel to a civil suit by the copyright holders where the proof would be by the preponderance of evidence.
Finally, RIAA’s position that the court award it restitution on behalf of its members is not supportable under Penal Law § 60.27. Under such section, restitution goes to “victims,” and not their trade associations. While the RIAA could be helpful to its members in future cases by compiling information as to the specific infringements of their individual copyrights by reason of the piracy so that the copyright holders can receive such *582 restitution, RIAA, no matter how it identifies with its members, is not the party whose property was taken.
Although the RIAA is not a proper party to receive restitution as a victim, the copyright holders are victims who could qualify as recipients of restitution; it is their property which was taken. While they may qualify, the award of restitution as a portion of a criminal sentence is discretionary with the court. Under the circumstances, the court declines to exercise its discretion to do so.
The evidence at trial indicated that the four CDRs which were introduced into evidence had tracks pirated from different copyright holders who were RIAA members. While there were other tracks on the CDRs, no evidence was introduced to establish that the sale of the other tracks was not authorized by their copyright holders. Castillo testified that while the vast majority of the recording industry were RIAA members, all were not. Thus, other tracks might or might not be copyrighted tracks pirated from non-RIAA members. It is difficult, if not impossible, to ascertain who all of the victims of this theft were.
Further, because of the nature of intellectual property, as compared to other property, it is not simple to determine the value of purloined rights. When a thief steals a pocketbook with cash, the value is easily knowable, and when a thief steals a car the valuation can be easily estimated by reference to market data reports. The value of the theft of the use of a song for inclusion in a recording with a dozen or more other songs is much more difficult to measure. While a court can usually ascertain the value of a pocketbook and the cash in the stolen pocketbook or the value of a stolen vehicle from testimony in the trial, there was no testimony here except for the prices paid for four CDRs at the store and material submitted at sentencing by RIAA as to the retail price of CDs — CDs which, if they included pirated tracks, also include many other tracks. Further, there is no evidence that retail prices are relevant. Few RIAA members who are the copyright holder are also retailers. Finally, the theft is of digital information,[15] and not the disc medium itself. Thus, the loss to the RIAA member should not include its cost of producing and shipping a disc. Finally, even if the court were to award restitution based on the full retail value of four CDs, it would amount to $68, a de minimis result.
*583 By declining to impose restitution, this court does not decide that Colon has no civil liability to the holders of copyrights for tracks on the CDRs sold or offered for sale, or the quantum of such monetary liability, if any. Such issues are left for another court in a civil case. As this decision on restitution issues in this case is discretionary, this decision may not be accorded precedential value, collateral estoppel or res judicata status in any other case or proceeding.
Although this court has ruled that scienter as to the failure to properly disclose information is unnecessary for conviction, and believes such position to be correct, it is not unmindful of the fact that appeals take time, and that an appeal may take longer than the sentence be imposed. Because of the lack of clear appellate guidance on the scienter requirement, this court will accordingly suspend execution of this sentence for 30 days to allow Colon to file a notice of appeal to the Appellate Division, provided further, that if such notice is so filed, execution of the sentence will be further stayed until such appeal is perfected and if such appeal includes a challenge to the failure of this court to charge such scienter in its charge, provided further that this stay shall in any event cease on the earlier of the decision of the Appellate Division on such appeal, or the dismissal of the appeal for any reason, or the withdrawal or dismissal of such ground of appeal.

. Because the sole difference between the first and- second degree crimes relates to the number of recordings involved, the disputed charge relates equally to both crimes.

. Some of this information is based on the Mapp hearing held prior to trial.

. At the hearing, there was evidence that the 200 seized digital video discs were counterfeits. As the indictment did not address the digital video discs, neither their presence at the store nor their seizure under the search warrant were discussed at trial.

. This fact is some evidence that sales were made “off of the books,” thus contradicting drama's testimony that after, paying salaries, the store made no money. The indictment did not charge sales or income tax violations.

. A DJ mix purports to be a collection of songs or tracks selected by a disc jockey at a club or other event venue based on his sensibilities. Nothing is inherently illegal in creating and/or selling a “DJ mix” if the “DJ” or mixer is authorized to reproduce such songs by the copyright holder and appropriate disclosures under Penal Law §§ 275.35 and 275.40 are made. Expert testimony at the trial indicated that often there was no club or event or, for that matter, even a real “DJ” for some of the DJ mixes being sold, drama’s testimony, given as expert testimony, casts a significant doubt on whether there are many legitimate DJ mix recordings as he testified that “his” store sold them but that the big stores did not. If there is a serious market for these recordings (drama testified that he was aware of over 200 stores selling them), it is unlikely that the big stores, who cater to every profitable niche of the market, would not be selling legal DJ mixes. That they do not sell them is, to this court, substantial evidence of the piracy of these recordings.

. See US Constitution, article I, § 8 (8), which authorizes Congress to issue trademarks, patents and copyrights.

. At the time of the initial enactment of Penal Law article 275 in 1990, the “state of the art” personal computer was the Apple II, which would have been incapable of “burning” music onto a CDR, even if there were CDRs available at that time, which they were not. When Penal Law article 275 was last amended in 1995, the principal method of reproducing music was by tape. (See Mem of Legislative Representative of City of NY, 1995 McKinney’s Session Laws of NY, at 2152.) The same concerns here of loss of sales tax and income tax revenue were present then. The introduction of CDR capability since such time has made the problem worse as such technology allows a better illegal product to be produced.

. There are digital audiotapes. However, this technology is not widely used.

. Penal Law § 275.35 also is designed to protect consumers against those who would pass off unknown artists as more famous recording artists known for particular songs. This is not of issue in this case.

. The footnote in McKinney’s Consolidated Laws of NY, Book 39, following Penal Law § 275.35 suggests the words “of which” were omitted. This view is probably correct as Penal Law § 275.35 as originally enacted in 1990 *578 by chapter 450 of the Laws of 1990 contained such words. A review of the legislative history of chapter 419 does not indicate any basis for the elision. A review of the enacting language (see L 1995, ch 419, § 7), however, indicates a probable draftsman’s error.

. Such a person may, however, be subject to civil liability under federal law for copyright infringement. However, persons who download songs without authorization from the copyright holder are no less “innocent” of the wrongfulness of their behavior than the person who “joy rides” another’s car, having found the keys in the ignition. That the wrongful taking can be done easily is neither proof that the taker did not know it was wrong nor is there an excuse that the taker disagreed with the law.

. A vendor of a folding knife is held criminally responsible for the length of the blade if over a certain size whether he knows or does not know that the length exceeds the maximum allowable length. (Administrative Code of City of NY § 10-134 [b].) A seller of a box cutter to an underage person is criminally liable regardless of what he thought or did not think the buyer’s age to be. (Administrative Code § 10-134.1 [c].) A thief of a pocketbook or wallet, being already in the larceny business, may be held liable for theft of the credit card inside, which may result in a greater penalty, even if he didn’t know the credit card was there and merely intended to steal money. (Penal Law art 155.) A person possessing or selling narcotic drugs is responsible for the weight possessed or sold even if he didn’t know the weight of the drugs or thought it less. (Penal Law art 220.)

. It might be said that a consumer should be more aware, as a matter of common sense, that a street vendor is purveying questionable goods than a retailer from a store on a commercial street, such as 125th Street, generally opened to the public. It is not unreasonable to protect the consumer in his or her expectations that stores sell legitimate goods.

. Placing the onus on the music retailer is not unreasonable as a retailer can avoid criminality by either buying from legitimate distributors, or if she wants to sell legal DJ mixes, she can do the necessary diligence, to assure that they disclose the name and address of the manufacturer.

. Note that federal copyright law provides specific dollar penalties for infringement to avoid this valuation problem.